## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDON PUGH, <br><br> Plaintiff, <br><br> v. <br><br> BERKS COUNTY BOARD OF ELECTIONS, <br><br> Defendant. | Civil Action No. 5:25-CV-03267 |

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**FACTS.** ........................................................................................................................... **2**

**STANDARD OF REVIEW** ............................................................................................ **3**

**ARGUMENT** ................................................................................................................ **4**

    I.   PLAINTIFF HAS STATED PLAUSIBLE CLAIMS FOR RELIEF. .................................................. 4

        A.  *Defendant Misapplies the Degree of Constitutional Scrutiny and, Alternatively, a Severe Burden is Shown under the Anderson-Burdick Test.*............................................ 4

        B.  *There is No Compelling Governmental Interest in Arbitrarily Refusing to Certify a Primary Nomination Winner, Disenfranchising Electors Who Voted for Such Candidate, and Forcing an "Empty Ballot" in the Municipal Election with No One to Vote for.*................................................................................................................. 8

           1.  Cluttered Ballots and Voter Confusion.................................................. 9

           2.  Minimum Level of Support. ................................................................. 10

           3.  Donald Duck and Protest Voting. ........................................................ 15

           4.  No Alternative Remedy. ...................................................................... 18

        C.  *What are We Left With?*.................................................................................. 22

    II.  BRANDON PUGH HAS STANDING TO RAISE HIS CONSTITUTIONAL CLAIMS........................ 24

        A.  *Under the First Amendment, Pugh is Harmed in His Capacity as a Member of the Republican Party.* ........................................................................................... 24

        B.  *The Defendant Shoulders the Burden of Proof Whether the Berks County Republican Committee Adopted Section 1405 of the Election Code.* .............................. 25

           1.  A Justiciable Controversy is before the Court........................................ 26

           2.  The Republican Party of Pennsylvania is a Federated Organization and the First Amendment and Article III Standing Respect Each Body as having Its Own Determinative Voice and Bylaws.......................................................... 28

**CONCLUSION** .......................................................................................................... **33**

# **FACTS.**

With five out of nine write-in ballots in the May 20, 2025 Municipal Primary — being 56% of votes cast — Brandon Pugh won the Republican nomination for the office of Mayor of Lyons Borough, a small electoral district where 41 Republican electors had cast a vote. But the Berks County Board of Elections refused to certify him as the nominee and, but for judicial relief, will not place Pugh's name on the official ballot for the forthcoming November 4, 2025 Municipal Election. The Court may additionally notice from the official, public records of the Defendant that the Democratic Party also did not nominate any candidate for Mayor of Lyons Borough in the May 20, 2025 Primary. [ECF No. 7-1, at 6]. Consequently, there will be an "Empty Ballot" for Mayor of Lyons Borough in the forthcoming Municipal Election but for judicial relief from this Court.

Defendant's Brief provides a helpful recitation of the Complaint for the Court, with one exception: First, it overlooked the disparate impact on write-in balloting verses obtaining signatures for a nomination petition in small and sparsely populated electoral districts like Lyons Borough. Brandon Pugh received five out of nine write-in ballots for Mayor of Lyons Borough in the May 20, 2025 Republican Primary. [ECF No. 1 ¶ 22]. And his five write-in ballots were out of 41 Republicans who participated in that Primary [id. ¶ 30], which is 12.2%. Conversely, there were 122 enrolled Republican voters in Lyons Borough. [Id.]. If Pugh had received 10 signatures on a nomination petition, then 10 out of 122 would be 8.2%. Primary nominations are governed by a majority of votes cast, never an absolute majority of all electors enrolled in the same political party in and for such electoral district.

Second, an elector in Pennsylvania who signs a candidate's nomination petition has gone no further than to formally ask the county board of elections to have the candidate's name "printed upon the Official Ballot of the aforesaid Party in said [Electoral] District, for the Municipal

Primary" for the public office in question. [Exhibit A (alteration added)]. Signers have no duty whatsoever to vote for that candidate in the Primary or to even vote at all. As further shown in the Argument Section, Pennsylvania does not follow the practice of other jurisdictions that the filing of a nomination petition has the legal effect of a "deemed nomination," with the cancellation of the Primary, if no other candidates files for the same office in the same Primary. The Argument Section will cite authorities why this distinction has constitutional significance — there's no equivalency in obtaining 10 signatures for a nomination petition and obtaining 10 write-in ballots in a Primary nomination for municipal office.

Defendant and Amici have challenged Pugh's standing for his First Amendment claim. The Election Code requires the State Committee of a political party to file a copy of its bylaws with Amici and for county committees of a political party to file copies of their bylaws with their respective county boards of elections. 25 P.S. §§ 2834, 2837. The *Rules and Bylaws of the Republican Party of Pennsylvania* in Exhibit B are filed with the Amici in their official capacity, and relevant portions of the *Bylaws and Rules of the Berks County Republican Committee* in Exhibit C are filed with Defendant in its official capacity, and the Court may judicially notice both as public documents. Fed. R. Evid. 201. From a public database maintained by the Pennsylvania Department of State,[1] the Court may judicially notice that the Republican Party of Pennsylvania is a domestic nonprofit corporation [File No. 6501820, Pennsylvania Department of State] and the Berks County Republican Committee is an unincorporated nonprofit association. [File No. 7566936, Pennsylvania Secretary of State].

## STANDARD OF REVIEW

"In a Rule 12(b)(6) motion, the court evaluates the merits of the claims by accepting all

---

[1] *Available at* https://file.dos.pa.gov/search/business

allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs," with all reasonable inferences therefrom, "and determining whether they state a claim as a matter of law. The defendant bears the burden of showing no claim has been stated." Gould Electronics, Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted). "[A]n exception to the general rule is that a document integral to or explicitly relied upon" in the non-movant's pleading "may be considered without converting the motion to dismiss into one for summary judgment." *In re* Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation omitted). Under the *Twombly/Iqbal* framework, "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." Id. (citations and internal quotations deleted).

## ARGUMENT

### I.    Plaintiff has Stated Plausible Claims for Relief.

#### A.    Defendant Misapplies the Degree of Constitutional Scrutiny and, Alternatively, a Severe Burden is Shown under the *Anderson-Burdick* Test.

Instead of strict scrutiny, the Defendant argues that the *Anderson-Burdick* balancing test should be applied, Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006) (discussing Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992)). [ECF No. 12-2, at 10]. For that test to apply, rather than for strict scrutiny, "the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech." Mazo v. New Jersey Secretary of State, 54 F.4th 124, 137 (3d Cir. 2022).

Here, where a plurality of votes cast in the May 20, 2025 Primary were for Brandon Pugh

for the Republican nomination for Mayor of Lyons Borough and that Pugh is a bona fide candidate who campaigned for those votes and is eligible to have his name placed on the official ballot, that is a severe deprivation of a "citizen's right to a vote free of arbitrary impairment by state action," regardless of how that impairment occurs. Baker v. Carr, 369 U.S. 186, 208 (1962).

A political party's selection of a Primary nominee is also core political speech relative to the right to associate. Under the First Amendment, "The moment of choosing the party's nominee, we have said, is the **crucial juncture** at which the appeal to common principles may be translated into concerted action, and hence to the political power in the community." California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) (emphasis added). The First Amendment gives "special protection" for "the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." Id. "As a starting point, it is useful to remember that until the late 1800's, all ballots cast in this country were write-in ballots." Burdick v. Takushi, 504 U.S. 528, 446 (1992) (Kennedy, *J.*, dissenting, joined by Blackmun and Stevens, *JJ.*). Thus, where Section 1405 of the Election Code seeks to impose a mandatory minimum of write-in ballots, that is just as much a policy decision that belongs to political parties and their members as whether to conduct the Open Primary or the Closed Primary at issue in California Democratic Party. "Regulating the identity of the parties leaders, we have said, may . . . color the parties' message and interfere with the parties' decision as to the best means to promote that message." California Democratic Party, 530 U.S. at 579 (quotation omitted). Strict scrutiny is therefore applied: The law or regulation must be narrowly tailored to serve a compelling governmental interest. Id. at 582.

As cited by Defendant, Rogers involved a challenge by political bodies (i.e., third-party

candidates)[2] to a provision in the Pennsylvania Election Code which required statewide candidates to submit nomination papers containing signatures from voters equal to 2% of the largest entire vote cast for any statewide elected candidate at the last preceding election. Rogers, 468 F.3d at 191 (discussing 25 P.S. § 2911(b)). Rogers thus involved challenges to ballot access (1) *outside* of a Primary nomination, (2) by an organization that is not a political party, and (3) concerning statewide rather than municipal public office. In that case, the Third Circuit distinguished "[p]olitical parties, i.e., at present the Republican and Democrat parties" which "place their candidates on the general election ballot via a primary system." Id. (citing 25 P.S. § 2862).

Defendant cites Burdick, which we more thoroughly address in Subpart B below. That case involved a facial challenge to a Hawaii law that banned write-in balloting, and the petitioner had sought to cast write-in ballots, in the primary and general election, namely, "**a protest vote for Donald Duck**." Burdick, 504 U.S. at 438 (emphasis added). In that case, the Court agreed  it was outcome-determinative that the petitioner "has characterized this as a voting rights rather than ballot access case" for a bona fide candidate. Id. at 437-38.

The Court can readily harmonize Burdick with California Democratic Party on the ground that, rather than a singular protest vote, we have a "crucial juncture" where a write-in candidate had won the highest plurality of votes cast in the May 20, 2025 Municipal Primary but a State actor refuses to certify that candidate as the party's nominee and place his name on the official ballot for the forthcoming Municipal Election. That the operation of Section 1405 of the Election Code as applied to the facts of this case would disenfranchise Pugh and other Republican electors in Lyons Borough who cast their write-in ballots for Pugh, and leave the Republican Party in Lyons

---

[2] What the public colloquially refers to as "third parties" are, in the Pennsylvania Election Code, regulated as a "political body," 25 P.S. §§ 2602(p), 2831(c), if failing to qualify as a statewide or countywide "political party," id. § 2831(a)-(b), or as a "minor political party." Id. § 2872.2.

Borough without any nominee at all for Mayor, thereby works a deprivation of core political speech at a crucial juncture. Section 1405, as applied here, is aimed at core political speech and therefore strict scrutiny applies.

In the alternative, if Defendant is hypothetically correct that the *Anderson-Burdick* balancing test applies, then its motion should still be denied under that standard. "When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (citing Burdick v. Takushi, 504 U.S. 428, 434 (1992) and Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)). The Court has never "identif[ied] any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." Crawford v. Marion County Election Bd., 553 U.S. 181, 191 (2008). Instead, "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" Id. (quoting Norman v. Reed, 502 U.S. 279, 288-289 (1992)). But if the law or regulation imposes a "severe burden," then strict scrutiny applies: the law or regulation "most be narrowly tailored and advance a compelling state interest." Timmons, 520 U.S. at 358.

Here, Brandon Pugh won the Republican Primary nomination for Mayor of Lyons Borough in the May 20, 2025 Municipal Primary. But Defendant arbitrarily refuses to certify him as the winner and to place his name on the official ballot for the forthcoming November 4, 2025 Municipal Election. Amici tell the Court that Pugh could conduct another write-in campaign in November. [ECF No. 15 at 7]. The U.S. Supreme Court expressly rejected that argument, even as

applied to independent candidates, reasoning that it is "not an adequate substitute for having the candidate's name appear on the printed ballot." <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 799 n.26 (1983). The facts of this case bear that out directly. Write-in candidates typically stand near the polling station and greet electors who offer to vote in-person. That makes write-in candidacies even more burdensome under Pennsylvania's Act 77, "no excuse" mail-in balloting system. <u>See, e.g.</u>, 25 <u>P.S.</u> §§ 3150.11 to 3150.18. Thus, electors in Lyons Borough, offering to vote by mail, have even greater harm by the Empty Ballot than those who vote in-person.

Accordingly, the Court must apply strict scrutiny here, even under the *Anderson-Burdick* balancing test. Defendant must show that the election law or regulation is necessary to serve a compelling state interest, <u>Williams v. Rhodes</u>, 393 U.S. 23, 31 (1968), and "narrowly tailored to serve [that] compelling State interest." <u>California Democratic Party</u>, 530 U.S. at 582 (alteration added).

**B.     There is No Compelling Governmental Interest in Arbitrarily Refusing to Certify a Primary Nomination Winner, Disenfranchising Electors Who Voted for Such Candidate, and Forcing an "Empty Ballot" in the Municipal Election with No One to Vote for.**

From the May 20, 2025 Municipal Primary, Brandon Pugh won the Republican nomination for the office of Mayor of Lyons Borough, a small electoral district where 41 Republican electors had cast a vote, with the highest plurality of five write-in ballots. But by reason of Section 1405 of the Election Code the Berks County Board of Elections refused to certify him as the nominee and, but for judicial relief, will not place Pugh's name on the official ballot for the forthcoming November 4, 2025 Municipal Election. Defendant and Amici ask this Court to be the first in our country to take the position that it's constitutional for a State actor to deprive a Primary nomination to a candidate who received the majority votes cast and was eligible to have his name placed on the official ballot or that voter confusion and "cluttered ballots" are reduced by having an Empty

Ballot with no one to vote for. Something is dramatically wrong with these arguments.

In administering the Pennsylvania Election Code, "Our goal must be to enfranchise and not to disenfranchise." Shambach v. Bickhart, 845 A.2d 793, 805 (Pa. 2004) (quotation omitted). When a write-in candidate petitions a county board of elections, as Pugh did here, to cumulate or identify write-in ballots, the county board is performing "the very essence of its functions: the ascertainment of the winning candidates." In re McCracken Appeal, 88 A.2d 787, 789 (Pa. 1952). "[N]othing can be more vital towards the accomplishment of an honest and just selection than the ascertainment of the intention of the voter." Id. at 789.

Under the Fourteenth Amendment of the U.S. Constitution, "A citizen's right a vote free from arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution," regardless of how that impairment occurs whether "by a false tally; or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box." Baker v. Carr, 369 U.S. 186, 208 (1962) (internal citations deleted). Under the First Amendment, primary nominations are "the crucial juncture" for a political party's right of association. California Democratic Party v. Jones, 530 U.S. 567, 575 (2000). The First Amendment gives "special protection" for "the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." Id. "Regulating the identity of the parties leaders, we have said, may . . . color the parties' message and interfere with the parties' decision as to the best means to promote that message." Id. at 579 (quotation omitted).

All purported governmental interests raised by Defendant and Amici fail the Anderson-Burdick balancing test, yet alone strict scrutiny, where Section 1405 of the Election Code (25 P.S. § 3155) is applied to the facts and circumstances of this case:

### 1.    Cluttered Ballots and Voter Confusion.

*First*, under the facts and circumstances of this case, county boards of elections are not

promoting any "unduly complicated or cluttered ballot that may confuse voters and make use of voting machines difficult." [ECF No. 12-2, at 12]. That relates to situations where there are numerous candidates running for the same public office in the same Primary or Election, not where, as here, *there is no one on the official ballot* at all for a particular public office in the forthcoming Municipal Election. Neither the U.S. Supreme Court nor the U.S. Court of Appeals for the Third Circuit had occasion to consider where, as here, the application of a statute or regulation would deprive a successful candidate of a Primary nomination, disenfranchise all electors who voted for that candidate, and produce an Empty Ballot, even for the major political parties. But even in respect of ballot access for minor parties the U.S. Supreme Court agreed there is no State interest "to keep all political parties off the ballot until they have enough members to win," which prevents parties from "working to increase their strength from year to year." Williams v. Rhodes, 393 U.S. 23, 32 (1968). The danger of a cluttered ballot cannot be "theoretically imaginable." Id. at 33.

As mentioned, forcing Brandon Pugh into a second write-in campaign for the Municipal Election is "not an adequate substitute for having the candidate's name appear on the printed ballot." Anderson, 460 U.S. at 799 n.26. No court in this country has taken such ground as to suggest that we avoid cluttered ballots, and reduce voter confusion, by having an Empty Ballot.

### 2.    Minimum Level of Support.

*Second*, under the facts and circumstances of this case, county boards of elections are not promoting "a minimum level of support" for a candidacy. [ECF No. 12-2, at 12]. Section 1405 incorporates by reference the minimum number of signatures for a nomination petition under 25 P.S. § 2872.1(36), which is 10 signatures for municipal office. This argument is superficially attractive but rests on several mistakes. Defendant and Amici cite caselaw relating to ballot access

for third parties and independent candidates,[3] which all assumed the normativity of a two-party system,[4] and therefore never considered where, as here, a State law results in an Empty Ballot with *no one* from to vote for from any party.

These authorities are inapposite to *Primary* nominations for organizations, like the Republican Party, that qualified as a "political party" under State law. A Primary "functions to winnow out and finally reject all ***but the chosen candidates***. The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences." Storer v. Brown, 415 U.S. 724, 735 (1974) (emphasis added). "The moment of choosing the party's nominee," such as the May 20, 2025 Primary, for First Amendment purposes is "the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to the political power in the community." California Democratic Party v. Jones, 530 U.S. 567, 575 (2000).  Therefore, "The purpose of the primary election is for voters to indicate support for a desirous candidate," Libertarian Party v. Jaeger, 659 F.3d 687, 700 (8th Cir. 2011), not to leave a party with no nominee at all.

Defendant and Amici rely upon Shankey v. Staisey, 257 A.2d 897 (Pa. 1969), which involved third-party candidates and did not have the benefit of the U.S. Supreme Court's teaching

---

[3] E.g., Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986) ("States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office."); Rogers v. Corbett, 468 F.3d 188, 190 n.1 (3d Cir. 2006) (Green Party candidate for governor, Constitution Party candidate for governor, and Libertarian Party candidate for U.S. Senate); Green Party v. Kemp, 171 F. Supp. 3d 1340 (N.D. Ga. 2016).

[4] The Supreme Court had repeatedly considered whether State law "freezes the status quo" of a two-party system, or whether "[i]t affords minority political parties a real and essentially equal opportunity for ballot qualification." American Party v. White, 415 U.S. 767, 787-88 (1974).  The "two-party system in this country is the product of social and political forces rather than of legal restrictions on minority parties." Williams, 393 U.S. at 60 (Stewart, *J.*, dissenting, joined by White, *J.*, and Warren, *C.J.*).

in <u>Storer</u> and <u>California Democratic Party</u>, just as much as it is inapposite, nonbinding, and unpersuasive. <u>Shankey</u> had no occasion to consider whether the application of Section 1405, as Defendant did here, would result in an empty ballot with *no one* qualifying for the official ballot and *no one* to vote for in the Municipal Election for the office of Mayor of Lyons Borough. But even if this Court were hypothetically to disregard the factual distinctions and look at the ballot access cases for third parties and independent candidates, State procedures for signature-gathering on nomination petitions are intended to make "rational voter choices" less difficult because of the "size of the ballot," and to weed out "frivolous candidacies," <u>Lubin v. Panish</u>, 415 U.S. 709, 715 (1974), rather than "keep[ing] all political parties off the ballot until they have enough members to win," which prevents parties from "working to increase their strength from year to year." <u>Williams</u>, 393 U.S. at 32.

Moreover, as a matter of disparate impact, courts must not only look at the number of signatures to get onto the official ballot, but also the "eligible pool" of who can sign. <u>Storer</u>, 415 U.S. at 741. Thus, a California statute in that case, imposing a 5% signature requirement based on returns from a preceding election, was not severe. But it disallowed voters, who had cast a vote in the Primary, from signing the nomination papers of any independent candidate. <u>Id.</u> at 740-41. That 5% therefore applied to a substantially smaller eligible pool of signers thereby potentially creating a disparate impact, <u>id.</u>, and therefore the case was remanded for further factfinding. <u>Id.</u> at 748.

A disparate impact is shown by the facts of this case. Before the Primary, the eligible pool of signers in Lyons Borough was 122 Republicans. If a Republican nomination petition for municipal office had exactly 10 signatures, the minimum required by the Election Code (25 <u>P.S.</u> § 2872.1(36)), then that would be 8.2% of Republican electors in Lyons. But here 41 Republican electors participated in the May 20, 2025 Primary, which is a smaller pool for a write-in candidate.

[ECF No. 1 ¶ 30]. With five write-in ballots, Pugh therefore received 12.2% of votes cast. The application of Section 1405 under the facts and circumstances, therefore, does not further any policy of having a "minimum level of support" as to nominations for municipal office in small or sparsely populated electoral districts like Lyons Borough. For these reasons, Amici erroneously tell the Court we pled "no facts" to explain why a minimum of 10 write-in ballots was burdensome as applied to the facts and circumstances of electoral districts like Lyons Borough. [ECF No. 15 at 7]. Defendant and Amici disregard the Complaint that only 41 Republican electors in Lyons participated in the May 20, 2025 Municipal Primary and the teaching in Storer about looking at the realities of the eligible pool of participants. Amici acknowledge that because Pugh is a member of Council, "he is presumably well-known and connected in a likely tight-knit community." [ECF No. 15, at 7]. Precisely our point. If someone like Pugh cannot get 10 write-in ballots within a small and sparsely populated electoral district like Lyons Borough, then Section 1405 is imposing a severe burden on constitutional rights under the *Anderson-Burdick* test.

Amici acknowledge for the Court that, in the forthcoming Municipal Primary, "there is no corollary" to Section 1405 for write-in balloting [ECF No. 13-1 at 7]. That is correct. See 25 P.S. § 3167 (highest plurality of votes cast in elections are declared elected). But how does that further a government interest that a candidate have a minimum level of support? Rather, it produces an anomalous result: Brandon Pugh can't receive the Republican nomination with five write-in ballots (25 P.S. § 3155), but with that same level of support he can win the Municipal Election (25 P.S. § 3167).

Pennsylvania does not follow any practice of having runoff primaries or runoff elections, if no one candidate receives at least 50% of votes cast. Rather, the highest plurality of votes cast has been the longest-standing policy and deeply rooted in ordered liberty derived from colonial

practice and the State and federal constitutions because (1) "those who abstain from voting be considered as acquiescing in the result declared by a majority of those who exercise the suffrage," Munce v. O'Hara, 16 A.2d 532, 532-33 (Pa. 1940); (2) compulsory participation is neither desirable nor practical, id.; (3) "Apathy is not the equivalent of open opposition," id. at 533 (quotation omitted); and (4) boycotting is "an ineffectual kind of opposition," even within a private association, and for "elections under the laws of the states or the United States, this has never been doubted." Id. (quotation omitted). Thus, Section 1405 does not further any compelling government interest that candidates have a minimum level of support.

Finally, nomination petitions in Pennsylvania are substantially and legally different than in other jurisdictions, which renders Section 1405 untenable under the minimum-level-of-support rationale. For as-applied constitutional challenges, a State's "ballot access scheme" must be construed "in its totality." Libertarian Party v. Jaeger, 659 F.3d 687, 693 (8th Cir. 2011) (citation omitted). The effects and consequences of signing a nomination petition in Pennsylvania go no further than to publicly say that the signer is ok with the candidate's name appearing on the Primary ballot. Petition signers have no legal obligations to vote for that candidate or even to vote at all in the Primary. See 25 P.S. § 2868. In Exhibit A, the Court may see a sample of Nomination Petition published by the Defendant on its website.[5] Anyone who signs, besides verifying their status as registered electors enrolled in the party, "hereby petition the County Board of Elections of [Berks] County to have the name of [candidate] . . . printed upon the Official Ballot of the aforesaid party in said [Electoral] District, for the Municipal Primary," etc. Signers have not even given a *recommendation* by signing a petition.

---

[5] *Available at* https://www.berkspa.gov/getmedia/21a526f2-2b97-403f-b13b-a087978efefb/3-Berks-Nomination-Petition-2025.pdf

Defendant therefore errs by telling the Court that "a candidate who appears on the primary ballot has already demonstrated a minimum level of support for their candidacy by filling out the nomination petition." [ECF 12-2, at 13]. No, they did not. The signing of nomination petitions in Pennsylvania does not effect a nomination, which stands in sharp contrast with the law of other jurisdictions which follow the practice that if only *one* candidate files for a political party's nomination, then the Primary for that public office will be canceled and the singular candidate is *deemed nominated*. See, e.g., Ga. Code § 21-2-153.1(b); 10 Ill. L. Comp. Stat. 5/7-5(b); Wis. Stat. § 8.50(3)(b). The survey by Amici of the law in other jurisdictions showed States which require write-in candidates to file a declaration of intent, or similar paperwork, in advance of the Primary — the same jurisdictions that follow the "deemed nomination" practice. [ECF No. 15 at 5 n.3].

The minimum level of support argument fails the *Anderson-Burdick* balancing test, much less strict scrutiny. A system for weeding out too many candidates *before the Primary* does not justify thwarting a party's ability to nominate any candidate by Primary.

### 3.    Donald Duck and Protest Voting.

Next, Defendant points out the famous Donald Duck case of Burdick v. Takushi, 504 U.S. 428 (1992). There, the facial validity of a Hawaii law, which prohibited write-in balloting by purposeful omission from the statute law, was upheld. That case involved a voter who filed suit concerning a 1986 election for State Representative in a legislative district in Honolulu, and "only one candidate filed nomination papers to run" for that office. Id. at 430. The petitioner had wanted to cast write-in ballots, in the primary and general election, namely, "**a protest vote for Donald Duck**." Id. at 438 (emphasis added). The Court agreed that the burden was not severe and States were not compelled to "record, count, and publish individual protests against the election system or the choices presented on the ballot through the efforts of those who actively participate in the system." Id. at 441. The Court, therefore, recognized as a facial challenge to the statute it was

outcome-determinative that the petitioner "has characterized this as a voting rights rather than ballot access case" for a bona fide candidate. Id. at 437-38. The write-in ballots were not to be cast for a real candidate, and therefore the Hawaii statute had imposed "only a limited burden on voters' rights to make free choices and to associate politically through the vote." Id. at 438-39.

Defendant and Amici make much of this case, but it is an "axiom that the holding of a judicial decision is to be read against its facts." Oliver v. City of Pittsburgh, 11 A.3d 960, 966 (Pa. 2011) (citation omitted). That is because "uncritical generalization is a path to error." Id. (quoting parenthetically Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc., 586 F.3d 500, 512 (7th Cir. 2009)).

In Burdick, the Court was not presented with the question where, as here, of a State actor refusing to certify a successful write-in candidate who won the Primary nomination and, unlike Hawaii, in a jurisdiction where write-in balloting is permitted. The Equal Protection Clause of the Fourteenth Amendment does not compel the States to enter into subject-matter that could be left unregulated, United Brotherhood of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 831 (1983), but, this being done, that similarly situated persons must have the equal benefit of the law and a "citizen's right to a vote free of arbitrary impairment by state action," regardless of how that impairment occurs. Baker, 369 U.S. at 208.

Where, as here, the law makes a voluntarily undertaking of write-in balloting within a Primary for a political party, and follows a rule of the highest plurality of votes cast, then Brandon Pugh is entitled to the equal benefit of such undertakings. In that regard, the Defendant's role in ascertaining the results of a petition to cumulate or identify write-in votes goes to "the very essence of its functions: the ascertainment of the winning candidates." In re McCracken Appeal, 88 A.2d 787, 789 (Pa. 1952). "[N]othing can be more vital towards the accomplishment of an honest and

just selection than the ascertainment of the intention of the voter." <u>Id.</u> at 789. That legislatures in other States have banned write-in balloting (but giving alternative remedies to avoid the Empty Ballot, see Subpart B.1, infra), is not a "free pass" for Defendant's voter disenfranchisement in primaries and elections where it is permitted.

On the other hand, Justice Kennedy's dissent in <u>Burdick</u> may be considered for *as-applied* constitutional challenges to restrictions or bans on write-in balloting. "As a starting point, it is useful to remember that until the late 1800's, all ballots cast in this country were write-in ballots." <u>Burdick</u>, 504 U.S. at 446 (Kennedy, *J.*, joined by Blackmun and Stevens, *JJ.*). The official ballot, which displaced the practice of the parties printing their own tickets, became introduced in America for the first time in 1888. <u>Id.</u> at 442 (citation omitted).

Where the Democratic Party was predominant in Hawaii, "Democratic candidates often run unopposed, especially in state legislative races." <u>Burdick</u>, 504 U.S. at 442 (Kennedy, *J.*, dissenting). "Large numbers of voters cast blank ballots in uncontested races, that is, they leave the ballots blank rather than vote for the single candidate listed." <u>Id.</u> at 442-43.

> Given that so many Hawaii voters are dissatisfied with the choices available to them, it is hard to avoid the conclusion that at least some voters would cast write-in votes for other candidates if given this option. The write-in ban thus prevents these voters from participating in Hawaii elections in a meaningful manner.

<u>Id.</u> at 443.

While Defendant dismissed write-in candidates as "opportunistic persons" [ECF No. 12-2, at 16], Justice Kennedy begs to differ: "Write-in voting can serve as an important safety mechanism in those instances where a late-developing issue arises or where new information is disclosed about a candidate late in the race." <u>Burdick</u>, 504 U.S. at 445. If voters are disenchanted with the candidate on the ballot, then "[t]he prohibition on write-in voting imposes a significant burden on voters, forcing them either to vote for a candidate they no longer support or to cast a

blank ballot. Write-in voting provides a way out of the quandary, allowing voters to switch their support to candidates who are not on the official ballot." Id. That rationale applies where, as here, no one had filed a Republican nomination petition at all for the office of Mayor of Lyons Borough. That is certainly a "late-developing issue."

Justice Kennedy also agreed that reducing voter confusion had no applicability to write-in campaigns because those voters "who go to the trouble of seeking out these candidates and writing in their names are well informed," therefore, "The state interest may well cut the other way." Burdick, 504 U.S. at 450.

Unlike Burdick, the instant case is commenced by a write-in candidate having received the highest plurality of votes cast and eligible to have his name placed on the official ballot. [ECF No. 1 ¶ 33]. The facts and circumstances of this case do not implicate protest voting and fails the *Anderson-Burdick* balancing test, much less strict scrutiny.

### 4. No Alternative Remedy.

Finally, Defendant cites Blair v. Hebl, 498 F. Supp. 756 (W.D. Wis. 1980) for the proposition that laws, like Section 1405, which restrict write-in balloting are constitutional so long as "there was available an alternative means of gaining access to the ballot through filing nomination papers." [ECF No. 12-2, at 13]. Before looking at whether the Defendant misunderstands or misapplies this case the important question at the outset is: What is Brandon Pugh's alternative remedy here? Briefly stated, forcing him into another write-in campaign is inadequate,[6] he can't be nominated by the Berks County Republican Committee if no one was nominated by Primary,[7] and, by reason of voting in the Republican Primary, he's ineligible from

---

[6] Anderson v. Celebrezze, 460 U.S. 780, 799 n.26 (1983).
[7] [ECF No. 7, at 14-16 (discussing Essler v. Davis, 419 A.2d 217 (Pa. Commw. Ct. 1980)].

filing nomination papers as a third-party or independent candidate.[8]

Amici helped the Court by surveying the law of other jurisdictions, but a closer look at the totality of these ballot access schemes substantially supports Pugh's as-applied challenge and furnishes even more reasons to deny this Motion. Amici identified 18 jurisdictions having statutes which impose a minimum threshold on write-in balloting to win a Primary nomination. [ECF No. 15, at 3-4 n.2]. But Amici neglected to point out that at least seven of these jurisdictions, unlike Pennsylvania, secure the right of governing committees of political parties to fill all vacancies on their ticket, including by reason of failure of electors to nominate by Primary. E.g., 10 Ill. L. Comp. Stat. 5/7-61, para. 8; Iowa Code § 43.77(1); Kan. Stat. § 25-3905(a); N.H. Rev. Stat. § 655:32; N.M. Stat. § 1-8-8; N.D. Cent. Code § 16.1-11-18; Vt. Stat. tit. 17, § 2381(a)(1). The Iowa Code makes that connection even more express, providing that if no candidate "filed for the party's nomination for that office" in the Primary and if "no candidate received a sufficient number of write-in votes to be nominated," then the vacancy on the ticket can be filled according to party rules. Iowa Code § 43.77(1). Because New Mexico allows political parties to fill all vacancies on the ticket after the Primary, as cited above, the law of that State avoids any administrative inconvenience by completely banning write-in balloting in municipal primaries. N.M. Stat. § 1-8-36.1.

Three additional jurisdictions cited by Amici still provide alternative remedies to ensure at least one candidate will be on the ballot in municipal elections. Wyoming allows the *governing body of the municipality* to nominate a candidate for a nonpartisan ballot if all political parties failed to nominate by Primary. Wyo. Stat. § 22-23-308(b). The strategy there appears to be that that's a better outcome than the customary practice of appointing. Tennessee and Ohio provide an

---

[8] 25 P.S. § 2911.1.

interesting innovation where primaries within most municipalities are generally cancelled and nonpartisan elections are used instead. Ohio Rev. Stat. § 3513.25 (municipalities having fewer than 2,000 residents); Tenn. Code § 2-13-208(a). If the municipality opts in, then political parties may either accept the Primary system with all its warts or opt out and nominate for municipal offices according to party rules. Tenn. Code § 2-13-208(a). That would have benefited small and sparsely populated electoral districts like Lyons Borough.

That cuts the number of jurisdictions cited by Amici from 18 to eight. For these remaining jurisdictions which, like Pennsylvania, impose a mandatory-minimum threshold on write-in balloting in primaries but don't seem to provide any identifiable remedy for the Empty Ballot, no constitutional challenge has thus far been raised in those jurisdictions. In the words of Chief Justice John G. Roberts, "[N]ovelty is not necessarily fatal; there is a first time for everything." Nat'l Fed. of Indep. Businesses v. Sebelius, 567 U.S. 519, 549 (2012).

The one exception here — Wisconsin — should cause the Court some significant pause. While disenfranchising 1,433 write-in ballots cast by Republican electors for a county row office candidate in a 1980 Primary, because the tally fell short of the statutory minimum of 5% from the last gubernatorial election, Wis. Stat. § 8.16(2), a federal court acknowledged the oddity of this statute, "On its face, it seems somewhat peculiar, *but there may be an explanation for it. The defendant has proffered none* . . ." Blair v. Hebl, 498 F. Supp. 756, 762 n.7 (W.D. Wis. 1980). Having failed to identify any rational basis for the statute, the court nevertheless upheld its constitutionality. Defendant cites this as persuasive and asks the Court to accept the same irrational basis and resulting voter disenfranchisement.

In that case, Philip J. Blair, a Republican write-in candidate for a county row office in Dane County, received 1,433 write-in ballots, the highest plurality of votes cast but had fallen short of

the statutory 5% threshold — which for that year would have been 2,746. Id. at 757. That Blair discounted the burden created by the Wisconsin statute is unpersuasive because it did not have the benefit of the Supreme Court's guidance that, under the First Amendment, "The moment of choosing the party's nominee, we have said, is the **crucial juncture** at which the appeal to common principles may be translated into concerted action, and hence to the political power in the community." California Democratic Party, 530 U.S. at 575 (emphasis added). The Blair Court did not have the benefit of the teaching that "a State, or a court, may not constitutionally substitute its own judgment for that of the Party" in the administration of primaries. Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 224 (1986) (quoting Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U.S. 107, 123-24 (1981)). With these authorities, the Blair Court should have recognized that the burden was severe and strict scrutiny should have been applied. [See supra Subpart A].

The Blair Court further reasoned that write-in candidates could have filed a nomination petition earlier-in-time. Blair, 498 F. Supp. at 761. That defeats the purpose of write-in balloting and misses the mark of a critical function it performs, as recognized by several justices of the U.S. Supreme Court in a dissenting opinion by Justice David M. Kennedy. All voting in this country before the 1880s was done by write-in balloting only and that "[w]rite-in voting can serve as an important safety mechanism in those instances where a late-developing issue arises or where new information is disclosed about a candidate late in the race." of Burdick v. Takushi, 504 U.S. 428, 445 (1992). (Kennedy, J., dissenting, joined by Blackmun and Stevens, JJ.). In Blair, the late-developing issue was that no other Republican candidate had filed a nomination petition for the county row office in question, and so Philip J. Blair threw his hat in the ring after the statutory deadline had lapsed because no one else did.

Blair is unpersuasive in light of the Supreme Court precedents which postdate it. The laws of other jurisdictions surveyed by Amici all show an adequate alternative remedy after the Primary which prevents the harm of the Empty Ballot. The Pennsylvania Election Code doesn't have that here. Defendant does not overcome the *Anderson-Burdick* test, much less strict scrutiny.

### C.    What are We Left With?

Defendant and Amici, having failed to identify any necessary compelling interest that is furthered by Section 1405, patently overlook  why Pugh brings an as-applied challenge rather than a facial challenge: From the directory sense of the term, "shall,"[9] and by process of elimination, Section 1405 is simply a matter *of administrative convenience only* that county election boards, like the Defendant, are generally relieved from having to entirely canvass the scattering of write-in ballots that occur every election cycle.

That makes a lot of sense in general. Brandon Pugh admits that to the Court, so why won't the Defendant and Amici likewise admit as much? It's not wrong to want that. Everyone in this case agrees Defendant shouldn't be burdened with canvassing the number of so-called "protest votes," whether for Donald Duck, or for pet cats, or for real persons who were not candidates and had not solicited such ballots.

Defendant and Amici do not want to acknowledge that Section 1405 is a rule of administrative convenience only because, even under the *Anderson-Burdick* balancing test, that means that Section 1405 must be dispensed with in individual cases like Pugh's. That is why the scope of our as-applied constitutional challenge is carefully qualified in the Complaint under four

---

[9] "In the primary the county board *shall not* certify" unless the minimum threshold is met. 25 P.S. § 3155 (last sentence) (emphasis added). "Indeed, it is widely accepted that most statutory provisions for the conduct of elections may be regarded as directory, and not mandatory, after the conduct of an election, unless the statute expressly declares that the particular requirement is essential to the validity of the election, or the violation as such impacts on the election result." Shambach v. Bickhart, 845 A.2d 793, 806 (Pa. 2004) (Saylor, *J.*, concurring).

conditions:

[1]      "[A] Municipal Primary is conducted for a political party" [ECF No. 1 ¶ 34] — this Court

is not being asked to compel a Primary in circumstances where the Election Code would not, such

as for organizations which do not qualify as a political party.

[2]      "[A] write-in candidate, otherwise eligible to have his or her name placed on the official

ballot, receives the highest plurality of votes cast for that same public office in the Municipal

Primary but less than the threshold under Section 1405 of the Election Code" [ECF No. 1 ¶ 34] —

This is the We-Are-the-Champions standard; the Court is not being asked to compel county boards

of election to lose their resources on losing, fictional, unsolicited, or frivolous candidacies by

persons who don't exist, or had lost the nomination to someone else, or are ineligible to have their

name placed on the official ballot.

[3]      "[S]uch candidate timely files with the county board of elections a petition to cumulate or

identify write-in votes and to be certified as and declared the nominee for that same public office"

[ECF No. 1 ¶ 34]. It's ok to put the burden on the write-in candidate if receiving fewer than 10

write-in ballots. If they fall below the Section 1405 threshold, then the write-in candidate should

timely find the county board rather than the county board find the write-in candidate.

[4]      "[T]he statute law affords political parties no other remedy for nominating candidates if no

one was nominated within a Primary Election for such public office" [ECF No. 1 ¶ 34] — nothing

stops Defendant and Amici, and other common interest organizations like the County

Commissioners Association of Pennsylvania, from lobbying the legislature to adopt the law of

other States, such as Alabama, where the governing committees of a political party may fill all

vacancies on their tickets regardless of how that occurred, including the failure to nominate by

Primary. Pugh admits he isn't harmed by this alternative, but Pennsylvania law currently disallows

that. [ECF No. 7, at 14-16 (discussing <u>Essler v. Davis</u>, 419 A.2d 217 (Pa. Commw. Ct. 1980)].

Without it, Pugh is left with nothing here but to petition the Defendant, which he timely did, to

cumulate or identify all write-in votes and to be certified as and declared the Republican nominee,

which the Defendant had denied to the extent of the latter.

## II.    Brandon Pugh has Standing to Raise His Constitutional Claims.

Finally, Defendant and Amici challenge Pugh's standing to bring his First Amendment

claim, though conceding his standing under the Fourteenth Amendment. Under the Fourteenth

Amendment, "[V]oters who allege facts showing disadvantage to themselves as individuals have

standing to sue." <u>Baker v. Carr</u>, 369 U.S. 186, 206 (1962). That clearly applies to Pugh here.

Under Pugh's First Amendment claim, to have Article III standing for a case or

controversy, "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to

the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." <u>Spokeo v. Robins</u>, 578 U.S. 330, 338 (2016) (citations omitted). The plaintiff bears the

burden of establishing these elements. <u>Id.</u> "For an injury to be particularized, it must affect the

plaintiff in a personal and individual way." <u>Spokeo</u>, 578 U.S. at 340.

### A.    Under the First Amendment, Pugh is Harmed in His Capacity as a Member of the Republican Party.

Here, the Complaint alleges that Pugh is a registered elector in Lyons Borough and enrolled

in the Republican Party. [ECF No. 1 ¶ 14]. Pugh campaigned as a write-in candidate for the

Republican nomination for Mayor of Lyons Borough and received the highest plurality of votes

cast for such office in the May 20, 2025 Municipal Primary. [<u>Id.</u> ¶ 18]. Pugh was entitled to vote,

and did in fact vote, in the May 20, 2025 Republican Primary in Lyons Borough, casting one of

the write-in ballots for himself for the office of Mayor. [<u>Id.</u> ¶ 18]. Pugh petitioned the Defendant

to cumulate his write-in ballots and to be certified as and declared the Republican nominee for

Mayor of Lyons Borough. [Id. ¶¶ 24-27]. The Defendant cumulated his write-in ballots but denied the balance of his request because he did not receive a minimum of 10 write-in ballots as required by Section 1405 of the Election Code (25 P.S. § 3155). [Id.]. But for the application of Section 1405, Pugh would be the Republican nominee for Mayor and was eligible to have his named placed on the official ballot for the forthcoming November 4, 2025 Municipal Election. [Id. ¶ 33].

To present a ripe, as-applied constitutional challenge to Section 1405 of the Election Code, the U.S. Court of Appeals for the Third Circuit has specifically ruled that a litigant must "wait until the votes had allegedly not been counted or certified before seeking injunctive relief." Constitution Party of Pennsylvania v. Cortes, 433 F. App'x 89, 94 (3d Cir. 2011).

Pugh has done so and, despite formally cumulating his write-in votes, by reason of Section 1405 of the Election Code the Defendant refuses to certify him as the nominee and include his name on the official ballot for the forthcoming Municipal Election. Section 1405 directly interferes with the will of Brandon Pugh and other members of the Republican Party in Lyons Borough in their capacity as members who voted within the May 20, 2025 Primary as the nominee for Mayor. Under the First Amendment, "The members of a recognized political party unquestionably have a constitutional right to select their nominees for public office." California Democratic Party v. Jones, 530 U.S. 567, 576 (2000) (quotation omitted). Pugh clearly has injury-in-fact as an elector enrolled in the Republican Party and a candidate for Mayor in the May 20, 2025 Republican Primary Election in Lyons Borough, having voted for himself and receiving the highest plurality of votes cast for that office. Significantly, granting declaratory and injunctive relief will redress the harm complained of, giving Pugh full, fair, and complete relief.

**B.    The Defendant Shoulders the Burden of Proof Whether the Berks County Republican Committee Adopted Section 1405 of the Election Code.**

Defendant, however, claims this isn't good enough: "Although Plaintiff's Complaint

purports to promote the major party's rights, thus far there is no indication that any political party shares his belief that the party's interest is best served by waiving enforcement of Section 1405's minimum-vote requirement to Plaintiff under the circumstances alleged." [ECF No. 12-2 at 14-15]. The U.S. Supreme Court expressly rejected this argument in Eu v. San Francisco County Democratic Cent. Comm. (*Eu II*), 489 U.S. 214 (1989) because it's improper burden-shifting. Political parties are not obligated to waive statutory provisions they never adopted from the outset. That political parties "continue to participate in the state-run primary process" does not "indicate that they favor each regulation imposed upon that process." Id. at 225 n.15. Standing under the First Amendment is shown if the "challenged law burdens the rights of political parties **and their members**," requiring a showing of strict scrutiny. Id. at 222 (emphasis added). Redressability, on the other hand, may be absent under the facts and circumstances of a particular case if (1) the bylaws of a political party contain the same rule complained of in the election law and (2) party officials have not indicated whether they would reform their bylaws if a challenged law was declared unconstitutional and enjoined. Ames v. Larose, 86 F.4th 729, 732-33 (6th Cir. 2023).

Therefore, based on Eu II and Ames, it's Defendant's burden to show that a relevant governing body within the Republican Party of Pennsylvania, through bylaws, has *affirmatively adopted* the rule in Section 1405 of the Election Code that Pugh complains of *and* has no intention of changing such rule if judicial relief were granted. A justiciable controversy is before the Court, and care is needed on how the First Amendment applies to federated organizations such as the Republican Party of Pennsylvania.

### 1.    A Justiciable Controversy is before the Court.

Where "the existence of a case or controversy is a jurisdictional prerequisite," Hodel v. Irving, 481 U.S. 704, 711 (1987), a court "always" has inherent power to "determine its own jurisdiction." United States v. Ruiz, 536 U.S. 622, 628 (2002) (citation omitted). Therefore, by

reason of Defendant challenging Pugh's Article III standing int this case, that presents a justiciable controversy in and of itself. Additionally, in respect of political parties, the nomination of candidates for inclusion on an official ballot prepared by State actors, and party membership in order to participate in a Primary, are independently justiciable controversies. Morse v. Republican Party of Virginia, 517 U.S. 186, 198 (1996) (nominating candidates for the purpose of inclusion on the official ballot is a delegated power subject to judicial review); Smith v. Allwright, 321 U.S. 649, 664-65 (1944) (membership in a party in order to vote in a Primary).

Like other private organizations, such as churches and religious associations, the judiciary may construe a political party's bylaws (1) to the extent of justiciable controversies and (2) under neutral principles of law, which are "objective, well-established concepts" in laws of general applicability governing organizations. Jones v. Wolf, 443 U.S. 595, 603-04 (1979). The neutral principles of law method does not infringe upon First Amendment rights because there is a legitimate governmental interest "in the peaceful resolution" of justiciable disputes. Id. at 602. "[T]he mere fact that the suit seeks protection of a political right does not mean it presents a political question." Baker v. Carr, 369 U.S. 186, 209 (1962). The political question doctrine is not implicated because "a court is not precluded from resolving purely legal disputes among the members of a political party," and in respect of a political party's bylaws the "courts have extensive experience with the interpretation and application of written governing instruments." Pego v. Karamo, 2024 Mich. App. LEXIS 9435, at *28 (Nov. 22, 2024). In the same way that courts "must defer to the resolution of the [religious] doctrinal issue by the authoritative ecclesiastical body" of a church or religious organization, Jones, 443 U.S. at 604, for political parties the courts must likewise defer to their governing committees for choices of "political policy." Pego, 2024 Mich. App. LEXIS at *14.

As a matter of neutral principles of law, the Pennsylvania Election Code contains "default rules" for the internal affairs of political parties, see, e.g., 25 P.S. §§ 2834, 2837, which are supplemented by the Associations Code, 15 Pa.C.S. § 101 et seq., and the common law, inclusive of agency and hermeneutics, id. § 110. The Associations Code is intended to have retroactive effect. Id. § 101(b).

The bylaws of the State Committee and county committees of a political party are public documents, filed respectively with the Pennsylvania Department of State and the county boards of elections. 25 P.S. §§ 2834, 2837. That serves the purpose of "providing a source of information for those members of the party or public interested in ascertaining what the adopted rules are." Casey v. Nuttall, 308 N.Y.S.2d 957, 961 (Sup. Ct. 1970). The bylaws of a private association "are law as to the members," Thompson v. Adams, 93 Pa. 55, 66 (1879) (unincorporated associations); 15 Pa.C.S. §§ 5505 (nonprofit corporations), 9125(b) (unincorporated associations), and "thus in general the law treats the association as essentially contractual." Grand Lodge v. Girard Lodge, 120 A.2d 523, 528 (Pa. 1956) (quotation omitted); Casey, 308 N.Y.S.2d at 962 (same rule applicable to political parties). Pennsylvania common law, inclusive of agency and hermeneutics, supplements the internal affairs of an organization unless displaced by the Associations Code or by a conflicting provision in the organization's bylaws or governing documents. 15 Pa.C.S. § 110. The same neutral principles of law were applied to the bylaws of a political party in Pego, 2024 Mich. App. LEXIS at *29-30, being "judicially discoverable and manageable criteria" for resolving a case or controversy. Id. at *30-31.

### 2.    The Republican Party of Pennsylvania is a Federated Organization and the First Amendment and Article III Standing Respect Each Body as having Its Own Determinative Voice and Bylaws.

The Republican Party of Pennsylvania, inclusive of the Berks County Republican

28

Committee, were organized in the 19th Century[10] and preexisted the 1937 enactment of the Pennsylvania Code. See Act of June 3, 1937, No. 320, 1937 Pa. Laws 1333.[11] Thus, the Election Code did not originate the internal structure for the Republican Party of Pennsylvania and may go no further than create rebuttable presumptions regarding the same. These rebuttable presumptions in the statute law are nevertheless helpful to this Court because the same shift the burden of production onto the Defendant to substantiate its objection for lack of standing.

Pennsylvania's Open Enrollment Law, allowing electors to enroll by political party when registering to vote,[12] creates a rebuttable presumption that enrolled electors are members of a party. 25 P.S. § 291. As shown in Rule 1.2 of the *Rules and Bylaws of the Republican Party of Pennsylvania*, Brandon Pugh's status as a party member is formally recognized upon his enrollment with a registration commission under Pennsylvania law:

> The Republican Party of the Commonwealth of Pennsylvania, which is a political party as defined in §2831 of the Election Code, shall consist of the following bodies:
>
> a.    The State Party (i.e., the Republican State Committee under §2834 of the Election Code);

* * *

---

[10] MORTON L. MONTGOMERY, HISTORY OF BERKS COUNTY IN PENNSYLVANIA 187 (1886) (Republican Party organized in 1856); id. at 482 (first Republican county commissioner elected in Berks County in 1875), *available at* books.google.com

[11] *Available at* https://www.palrb.gov/Preservation/Pamphlet-Laws/View-Document/19001999/1937/0/act/0320.pdf

[12] Under the last-in-time principle, the Open Enrollment Law of 1913 is partially superseded to the extent subsequently enacted statutes have administratively transferred the functions of voter registration to registration commissions in each county, responsible for registering electors and enrolling them in their chosen party. 25 Pa.C.S. §§ 1203(a) (establishing commissions in each county), 1327(a)(1)(v) (registration forms to designate political party enrollment), 1503 (change of enrollment of political party). Other, enumerated government agencies may distribute and receive voter registration applications, but completed applications are typically forwarded to a registration commission for the elector's county. Id. §§ 1201, 1325.

d.      Republican County Committees, as defined in §2837 of the Election Code (the "County Committees"), and such subordinate committees of a County Committee as the rules of a County Committee shall provide.

* * *

g.      **All validly registered Republican electors in the Commonwealth of Pennsylvania.**

[Ex. B, Rule 1.2, Rules and Bylaws of the Republican Party of Pennsylvania (filed Sept. 25, 2015) (emphasis added)]. In his capacity as an enrolled member of the Republican Party, Pugh is entitled to vote for nominations within Pennsylvania's Closed Primary. 25 P.S. §§ 299, 2832.

The foregoing rule shows that the Republican Party of Pennsylvania is in the nature of a "federated organization" because it has many bodies, including unincorporated nonprofit associations, which is permitted under the Associations Code. 15 Pa.C.S. § 5754(a). For purposes of the First Amendment and Article III standing, each body within a federated organization has its own determinative voice and bylaws, including a State Committee and county committees. 25 P.S. §§ 2834, 2837; Eu I, 826 F.2d at 824 ("[T]he State has still failed to show that plaintiffs do not have standing to bring suit for the infringement of their First Amendment rights as party officials, county committees, and party members."); id. ("county committees" of a political party may under the First Amendment assert "*their* rights to speak freely" (emphasis in original)).

The members, such as Brandon Pugh, are also a body within the Pennsylvania Republican Party. For First Amendment purposes, members of a political party may assert their own claims for injury-in-fact in their capacity as members and where the bylaws of the relevant governing committees — State or county — have no provision to the contrary. San Francisco County Democratic Cent. Comm. v. Eu (*Eu I*), 826 F.2d 814, 824 (9th Cir. 1987), aff'd sub nom., 489 U.S. 214 (1989) ("Nor has the State explained why the individual party members cannot challenge these statutes as an infringement"). "[P]olitical parties as well as individual party adherents enjoy First

30

Amendment Rights." Id. at 818. Federal courts may not "erroneously assume that the only bodies capable of challenging the statutes are the party state central committees." Id. at 823. "The associational rights of political parties and their members to choose their own governing body would be of little avail if a statute imposing a state-created and selected governing body could only be challenged by the governing body the state imposed." Id. at 824.

Amici cite California Democratic Party v. Jones, 530 U.S. 567, 571 (2000) and Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 211 (1986), where governing bodies of political parties had adopted party rules that conflicted with a State election law. "But the Supreme Court nowhere suggested in Tashjian that the adoption of a conflicting bylaw was necessary to confer standing or to show infringement of a First Amendment right." Eu I, 826 F.2d at 823. California Democratic Party did not alter that outcome and did not address membership standing. On the contrary and as previously mentioned, "The members of a recognized political party unquestionably have a constitutional right to select their nominees for public office" within a Primary. California Democratic Party v. Jones, 530 U.S. 567, 576 (2000) (quotation omitted).

"The fact that no state central committee currently has bylaws that conflict with the challenged statutes hardly indicates that those statutes do not restrict the parties' First Amendment rights." Eu I, 826 F.2d at 823. "We also reject the State's suggestion that if political parties are reluctant to violate the statutes they must obtain standing by adopting bylaws that conflict with the statutes and then disregarding those bylaws in actual practice. Institutions are not required to make the empty gesture of passing rules" which are either "void as a matter of law" or "ignored as a matter of institutional practice in order to satisfy standing requirements," as that would be a "futile gesture . . ." Id. at 823.

The Election Code creates a rebuttable presumption that, in respect of Berks County, the

Berks County Republican Committee ("BCRC") makes rules "for the government of the party in the county," 25 P.S. § 2837. Where carefully construed in respect of nominating candidates for *public* office only,[13] nothing within the *Rules and Bylaws of the Republican Party of Pennsylvania* rebuts that presumption. Pages 17 and 18 of such bylaws reinforce the different jurisdictions of the State Committee and the county committees where filling vacancies on the Republican ticket: The State Committee's jurisdiction is limited to (1) nominations for statewide public office [Ex. B, Rule 10.1]; and (2) if an electoral district is composed of more than one county by less than statewide, then nominations for U.S. Representative, State Senator, State Representative, and judge in any judicial district [id., Rule 10.2]. The county committees therefore exercise jurisdiction in all other cases and coextensive with the jurisdiction of their respective county boards of elections, such as (1) nominations in electoral districts composed of not more than one county, including all political subdivisions within the county [id., Rule 10.4]; and (2) nominations for school director and municipal public office for political subdivisions situated in more than one county, but in respect of the county "in which the major number of the registered electors . . . reside." 25 P.S. § 2873(a).

Therefore, because Lyons Borough is situated in Berks County, Defendant would have to show that the BCRC had adopted Section 1405 of the Election Code. In Exhibit C, the Court will find no provision to that effect in the BCRC's Bylaws. Defendant's argument as to lack of standing is meritless, therefore.

Accordingly, Pugh has standing to bring his First Amendment claim. He has suffered injury-in-fact in his capacity as a member of the Republican Party, the party having never

---

[13] The facts of the instant case do not draw the Court into the question of party offices, such as choosing delegates for the National Convention and members in the State Committee and county committees.

affirmatively adopted Section 1405 of the Election Code, and the same is directly traceable to the conduct of the Defendant. The harm Pugh complains of is redressable by judicial relief. Defendant has not shouldered its burden of proving otherwise. All inferences are in Pugh's favor on a Rule 12(b)(6) pre-Answer motion and Defendant may not raise fact defenses at this stage.

## **CONCLUSION**

**WHEREFORE**, based on the foregoing, Plaintiff respectfully requests that the Honorable Court deny the instant Motion.

Respectfully submitted

**CORNERSTONE LAW FIRM, LLC**

Dated: <u>August 1, 2025</u>          By:     <u>/s/ Joel A. Ready</u>
                              Joel A. Ready, Esquire
                              Attorney I.D. #321966
                              8500 Allentown Pike, Suite 3
                              Blandon, PA 19510
                              (610) 926-7875
                              joel@cornerstonelaw.us